FILED

APR 2 6 2011

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ELZIE LEE HOWARD, JR.,

   Plaintiff,

              CV 09-1508-PK

              FINDINGS AND
v.             RECOMMENDATION

MICHAEL J. ASTRUE,
Commissioner of Social Security,

   Defendant.

_____

PAPAK, Magistrate Judge:

   Plaintiff Elzie Lee Howard, Jr., filed this action December 28, 2009, seeking judicial

review of the Commissioner of Social Security's final decision denying his application for

supplemental security income ("SSI") benefits under Title XVI of the Social Security Act (the

"Act"). This court has jurisdiction over plaintiff's action pursuant to 42 U.S.C. § 405(g) and

1383(c)(3).

Page 1 - FINDINGS AND RECOMMENDATION

Howard argues that the Commissioner failed properly to assess his residual functional capacity after completing step three of the five-step sequential process for analyzing a Social Security claimant's entitlement to benefits, and thereby failed to carry his burden at step five of the process. I have considered all of the parties' briefs and all of the evidence in the administrative record. For the reasons set forth below, the Commissioner's final decision should be affirmed.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. § 416.920(a)(4). At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge considers the claimant's work activity, if any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. § 416.920(a)(4)(i). If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 416.920(a)(4)(i), 416.920(b). Otherwise, the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments.

Page 2 - FINDINGS AND RECOMMENDATION

*See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. § 416.920(a)(4)(ii). An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 416.920(c). The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b); *see also Bowen*, 482 U.S. at 141. If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.920(c).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d). If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. § 416.920(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related, physical and mental activities on a regular and continuing basis,[1] despite the limitations imposed by the

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

claimant's impairments. *See* 20 C.F.R. § 416.945(a); *see also* S.S.R. No. 96-8p, 1996 SSR

LEXIS 5.

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the

claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §

416.920(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can

still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*,

482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(iv), 416.920(f). In the event the claimant is

no longer capable of performing his or her past relevant work, the evaluation will proceed to the

fifth and final step, at which the burden of proof is, for the first time, on the Commissioner.

At the fifth step of the evaluation process, the ALJ considers the RFC in relation to the

claimant's age, education, and work experience to determine whether the claimant can perform

any jobs that exist in significant numbers in the national economy. *See Bowen*, 482 U.S. at 142;

*see also* 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. If the Commissioner

meets its burden to demonstrate that the claimant is capable of performing jobs existing in

significant numbers in the national economy, the claimant is conclusively found not to be

disabled. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(g),

416.960(c), 416.966. A claimant will be found entitled to benefits if the Commissioner fails to

meet its burden at the fifth step. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§

416.920(a)(4)(v), 416.920(g).

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied

proper legal standards and his or her findings are supported by substantial evidence in the record.

*See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r for Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id.*, *citing Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of the Commissioner. *See id.*, *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006); *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible [of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

## BACKGROUND

Howard was born September 30, 1969. Tr. 74-76.[2] He received a General Educational Development high school equivalency diploma in 1988, and has received no subsequent formal education. Tr. 77-82. On August 5, 1994, Howard was injured when a motor vehicle struck him while he was walking on a sidewalk. Tr. 130-131. Howard was in a coma for several days following the incident, and remained hospitalized for approximately one month. *Id.* As a result of the incident, Howard's memory and other cognitive functions are impaired, he has experienced

---

[2] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed herein as Docket No. 12.

intermittent auditory hallucinations, he has suffered from vertigo, and he has suffered lasting injury to his right leg. *Id.*

Although Howard several times indicated in support of his application for SSI benefits that he was unable to remember any of the employment positions he has held over his lifetime, Tr. 105-110, 115-124, or was unable to remember employment other than his most recently held job position, Tr. 49-56, his earnings records indicate that he worked for 6 hours in the first quarter of 2003 for Aerotek, Inc., that he worked a total of 497 hours for Labor Ready Northwest, Inc., from the third quarter of 2000 through the second quarter of 2001, and that in the fourth quarter of 2000 he worked for one hour for Employers overload and 95 hours for DNBW Enterprises, LLC. Tr. 89. It appears that each of these employers was a temp agency. Tr. 89. Howard reports that he also worked for a bindery from February 2004 through October 2004, Tr. 77-82, a job that apparently required him to walk or stand for most of a twelve-hour shift, Tr. 78, 495, 502. In addition, when providing testimony at a hearing before an Administrative Law Judge, Howard was able to recall that after his August 1994 injury he worked for approximately six or seven months as a laborer for a home construction business, and that his employment as a home construction laborer ended when the business closed down. Tr. 511.

It appears that, on April 30, 2001, Howard made a previous application for SSI benefits, claiming a disability onset date of August 5, 1994. Tr. 18. It further appears that Howard's previous claim for benefits was denied effective January 22, 2004, with a finding of non-disability, and that Howard did not appeal the Commissioner's adverse decision on his 2001 application. *Id.* The parties appear to agree that Social Security Acquiescence Ruling 97-4(9) does not require any presumption of continuing nondisability following the January 22, 2004,

decision.

On June 13, 2005, Howard applied again for SSI benefits.[3]  Tr. 18, 74-76.  Howard described his allegedly disabling condition at that time as consisting of right leg pain, dizziness, memory problems, and insomnia.  Tr. 77-82.  At the time of his application, Howard asserted that these conditions left him unable to work as of August 5, 1994, although it appears that he now claims a disability onset date of November 30, 2004.[4]

The earliest medical report appearing in the administrative record dates from August 27, 2001, at which time Howard underwent an X-ray study of his right knee.  Tr. 347.  The study uncovered no abnormalities.  *Id.*  On April 2, 2002, Howard was seen by David S. Wakeling, M.D., complaining of right knee pain.  Tr. 330-343, 426-439.  Dr. Wakeling prescribed ibuprofen and physical therapy.  *Id.*  On April 23, 2002, Howard reported that his pain was worse following physical therapy, and was prescribed vicodin and additional physical therapy.  Tr. 372-373.

On May 30 and again on June 5, 2002, Howard was seen in connection with a cyst on his

---

[3]  Several documents within the administrative record indicate "protective filing dates" for Howard's application that pre-date June 13, 2005: a protective filing date of November 30, 2004, is indicated in the Agency's Field Office Disability Report of December 2, 2004, Tr. 74-76, and a protective filing date of February 24, 2004 is indicated in the Agency's Field Office Disability Report of March 2, 2004, Tr. 101-104.  However, for purposes of an application for SSI benefits, an oral or written inquiry preceding the filing of an application may only serve as an effective protective filing date if the application is actually filed within sixty days following the Agency's notice to the claimant that an application is required.  *See* C.F.R. §§ 416.340, 416.345.  Here, Howard filed his application more than sixty days following his receipt of such notice, so that Howard is not entitled to rely on any protective filing date pre-dating June 13, 2005, the date his application was actually filed.

[4]  SSI benefits are not available retroactively, so that as a practical matter the earliest disability date that may be claimed for purposes of SSI benefits is the protective filing date of a claimant's application.  *See* 20 C.F.R. § 416.501.  Here, however, because Howard cannot rely on any effective protective filing date prior to June 13, 2005, the earliest date he can be eligible for SSI benefits is June 13, 2005, the date he filed his application.

left arm. Tr. 370-371, 368-369. The cyst was removed June 12, 2002, in a surgical procedure. Tr. 366-367.

On July 18, 2002, Howard reported to the emergency room at Emanuel Hospital complaining of abdominal pain. Tr. 322-329, 418-425. He was diagnosed with pancreatitis. *Id.*[5] On August 2, 2002, Howard was seen to follow-up on his emergency room visit. Tr. 364-365. Five days later, on August 7, 2002, Howard underwent an abdominal tomographic scan procedure that revealed indications of chronic pancreatitis. Tr. 321, 345-346, 417. However, the procedure revealed no indications of any focal pancreatic mass, no cystic lesions, and no acute inflammation. *Id.* Howard attended an additional follow-up appointment on August 14, 2002. Tr. 362-363.

On September 4, 2002, Howard met for the first time with LuRae Levering, L.C.S.W., to discuss mental health issues including his auditory hallucinations, insomnia, depression, vertigo, and fatigue. Tr. 289-295, 385-391. Levering opined that Howard suffered from psychotic disorder due to brain injury with hallucinations and planned to refer him for a psychiatric evaluation. *Id.* On September 6, 2002, Howard reported hand and leg pain and stiffness to his physician, and was prescribed ibuprofen. Tr. 360-361. On September 11, 2002, Howard consulted again with Levering regarding his mental health issues. Tr. 384.

On October 25, 2002, Howard reported to the emergency room at Emanuel Hospital complaining of abdominal pain relating to his pancreatitis. Tr. 308-320, 404-416. He was seen to follow-up on his ER visit on October 28, 2002. Tr. 354-355. On December 28, 2002, Howard

---

[5] Howard apparently advised his health care providers that he had undergone a surgical procedure relating to his pancreatitis in or around November 2001, but there are no records of any such procedure in the administrative record.

returned to the ER complaining of vomiting related to his pancreatitis. Tr. 297-307, 393-403. On December 30, 2002, followed up on that visit, reporting to his physician his vomiting symptoms and increased pain in his right knee. Tr. 350-353. On January 3, 2003, Howard was seen to follow up on his right knee pain symptoms; an MRI study of his right knee revealed a meniscal tear. Tr. 348-349. The knee was deemed stable and appropriate for surgical repair. *Id.*

On January 21, 2003, and then again on February 6, 2003, Howard consulted with Matt Schiff, M.A., C.A.D.C., to discuss an appropriate mental health treatment plan. Tr. 381-382, 378.

Disability Determination Services referred Howard to Jana Zeedyk, Ph.D., for a psycho-diagnostic interview that took place December 29, 2004. Tr. 258-263. Zeedyk's report indicates that in the course of evaluating Howard Zeedyk reviewed medical records that have not been made part of the administrative record, including orthopedic surgery consultation notes from August 37, 2001, an independent medical examination of January 16, 2002, behavioral health assessment progress notes dating from between September 11, 2002, and February 28, 2003, and a psychological evaluation conducted by James E. Bryan, Ph.D., on June 28, 2001. *Id.* In addition, Zeedyk conducted a Mini Mental State Examination and interviewed Howard personally. *Id.*

Zeedyk noted clear inconsistencies between Howard's recitation of his personal history to her and the personal history provided to prior interviewers whose reports Zeedyk reviewed. *Id.* For example, Howard denied to Zeedyk that he had ever been married or lived with a partner, but apparently advised Bryan that he had been married for two years. *Id.* Similarly, he advised Zeedyk that he had a single child, then aged 18, whereas he had advised Bryan that he had three

children by different mothers, and Levering that he had six children. *Id.* He likewise advised Zeedyk that he had once been charged with a crime, whereas records indicated that Howard had reported to Levering that he had been imprisoned from 1987 to 1994, and to Bryan that he had been incarcerated twice, once for 24 months and once for 18 months. *Id.* In addition, he told Zeedyk that he had never used alcohol, that he used to drink, and that he was at that time drinking a couple of times per month. Zeedyk noted that the records she reviewed contained multiple recommendations that Howard undergo alcohol rehabilitation treatment, and contained in addition numerous indicators of heavy alcohol use and tolerance. *Id.*

Howard described his auditory hallucination symptoms to Zeedyk as hearing people calling his name when no one else was present. *Id.* Howard also reported to Zeedyk that he was phobic around cars following the incident in which he was injured, and that he tended to isolate himself socially due to a fear that people would try to kill or harm him. *Id.* He also reported that he tended to wake up every two hours when sleeping at night for no discernable reason. *Id.*

Zeedyk reported that Howard received a score of 27 on the Mini Mental State Examination, a score considered to indicate normal cognitive function. *Id.* Zeedyk diagnosed Howard with psychotic disorder due to brain injury with hallucinations, although she noted that, other than through his self-report of auditory hallucinations, he presented no clear signs of psychosis. *Id.* Zeedyk's notes indicate that Howard told her he was nervous when required to be around "a lot of people," and that he worries that strangers might try "to do something" to him, perhaps even "kill" him. *Id.* She also recorded Howard's self report that he was having issues with "anger control." *Id.*

On January 24, 2005, Howard saw Leslie Davidoff, M.D., for a comprehensive

Page 10 - FINDINGS AND RECOMMENDATION

orthopedic examination. Tr. 272-276. Howard reported to Davidoff that his right knee pain was intermittent, sometimes gone altogether-but tending to increase with activity, and that his symptoms of insomnia were partly caused by his knee pain and partly by memories of the incident in which he was injured. *Id.* Howard further reported that he was able to and did perform his own independent self-care, and that he helped his mother (with whom he lived) with housework, yardwork, and shopping. *Id.* Davidoff expressed some concern with Howard's "gauntness," noting that Howard had lost considerable weight since being diagnosed with pancreatitis, and opined that continued weight loss could reduce Howard's stamina. *Id.* Davidoff opined that Howard could stand or walk six hours out of an eight hour workday with hourly breaks, that he could sit without restrictions, that he could lift or carry 20-50 pounds occasionally and 10-25 pounds frequently, and that he should avoid heights and avoid jobs requiring intact memory. *Id.*

On February 2, 2005, Howard consulted with Darren Gillette, M.D., reporting diarrhea and vomiting. Tr. 228-230, 238-239. Howard underwent a CT scan of his abdomen, which revealed extensive pancreatic calcifications consistent with chronic pancreatitis, and colonic edema consistent with transverse colitis. *Id.* On February 9, 2005, Howard consulted with Nitisha Agate, M.D., in connection with his symptoms, which Agate diagnosed as relating to diabetes. Tr. 175-178. Agate went over Howard's past chart notes and found elevated blood sugars going back to at least 2002; according to Agate, this had been previously misinterpreted as secondary to Howard's pancreatitis, whereas in her estimation it had in fact been due to diabetes. *Id.*. Agate saw Howard again on February 22, 2005, and referred him to an endocrinologist[6] and

---

[6] Howard ultimately elected not to see the endocrinologist due to lack of funds.

a diabetes maintenance program.  Tr. 179-181.

Howard reported to Dorothy Anderson, Ph.D., for a mental residual functional capacity assessment on March 1, 2005.[7]  Tr. 240-257.  Anderson diagnosed Howard with psychotic disorder due to brain injury with hallucinations, dysthymic disorder, major depression, adjustment disorder with anxiety and depressed mood, anxiety disorder not otherwise specified, antisocial traits, antisocial personality disorder, and a history of alcohol dependence.  *Id.* Anderson assessed Howard as mildly limited in activities of daily living, moderately limited in maintaining social functioning and moderately limited in maintaining concentration, persistence or pace (including moderate limitations in carrying out detailed instructions and in working in coordination with or proximity to others without being distracted by them).  *Id.*

Howard reported to Martin Kehrli, M.D., for a physical residual functional capacity assessment on March 2, 2005.  Tr. 264-271.  Kehrli diagnosed Howard with right knee arthritis, with secondary diagnoses of vertigo, memory problems, and insomnia.  *Id.*  Kehrli assessed Howard as able to occasionally lift and/or carry 50 pounds, to frequently lift and/or carry 25 pounds, to stand and/or walk approximately six hours in an eight-hour workday with ordinary breaks, to sit approximately six hours in an eight-hour workday, as having no limitations on pushing or pulling, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations except that he should avoid all exposure to hazards,

---

[7] The record does not make clear why Howard was referred for a mental RFC assessment at this time.  On March 1, 2005, Howard's April 30, 2001, application for SSI benefits had already been denied (effective January 22, 2004), and he had not yet filed a new application.  It is possible that this referral, and his referral for a physical RFC assessment taking place March 2, 2005 (discussed *infra*), were made in connection with an inquiry Howard or his representative made to the Agency on February 4, 2004.  Tr. 101-104.

and as having occasional limitations on climbing ladders, rope or scaffolding, and on kneeling,
crouching, and crawling. *Id.* Kehrli specifically opined that Davidoff's January 2005 opinion
that Howard needed hourly breaks in order to stand for six out of eight working hours was not
supported by the body of evidence in the file, stating that "it is reasonable for claimant to
stand/walk with routine breaks." *Id.* Kehrli also opined that Howard's self-report of the
limitations on his activities of daily living were only "partially consistent" with the objective
medical findings. *Id.* Kehrli assessed Howard with a "light RFC." *Id.*

On March 7, 2005, Howard began seeing Debra Jones, M.S.W., for assistance with
obtaining medication and supplies in connection with treatment for his diabetes. Tr. 162.
Howard saw Jones again on March 8, 2005, at which time she referred him to Christopher Blem,
Pharm.D., for assistance with understanding and taking his medications. Tr. 163-165. Howard
met with Blem for the first time on March 11, 2005. Tr. 182-183. Blem instructed Howard in
how to self-administer insulin therapy. *Id.*

Howard consulted with Agate on March 15, 2005, in connection with his diabetes. Tr.
184-186. Agate opined that Howard was doing well, and described his condition as "normal."
*Id.* On March 18, 2005, Howard met again with Blem, who recommended some changes to
Howard's diabetes medications. Tr. 187-188.

On March 29, 2005, Howard underwent X-ray studies of both knees in connection with
his reports of knee pain. Tr. 209-212, 234-237. The studies revealed mild to moderate
osteopenia in both knees, but no fractures, dislocations, joint effusion or narrowing of articular
spaces. *Id.*

Howard returned to Agate's offices on April 11, 2005, to follow up in connection with his

diabetes treatment. Tr. 189-192. Agate opined that Howard was doing well, and adjusting better to his insulin treatment. *Id.* She noted, however, that he still complained of knee pain. *Id.* On May 17, 2005, Agate saw Howard again, for the purpose of signing a pain contract and increasing his pain medications. Tr. 193-194.

On June 2, 2005, Howard reported to his health care providers that he had experienced severe diarrhea of two weeks' duration. Tr. 171, 195. On June 3, 2005, Jacob Jones, M.D., saw Howard for his diarrhea symptoms, and recommended enzyme supplements and modifications to Howard's diet. Tr. 198-199. Howard's diarrhea symptoms worsened to the point that he became hyponatermic and was hospitalized from June 5 to June 6, 2005. Tr. 219-227. Physician Nicholas Statkus, M.D., noted Howard's noncompliance with the prescribed changes to his diet. *Id.* On June 7, 2005, Howard was seen again by Jones, who opined that the diarrhea symptoms were improved, but also noted Howard's noncompliance with the prescribed enzyme supplements and recommended supplemental pancrelipase. Tr. 196-197, 200-201.

On June 13, 2005, Howard formally applied for SSI benefits.

On June 20, 2005, Howard was seen for a follow-up appointment in connection with his recent bout of severe diarrhea. Tr. 202-204. David M. Scholle, M.D., opined that with pancreatic enzyme supplements, Howard was doing much better, with firm stools. *Id.*

On July 8, 2005, Howard underwent an assessment of his physical residual functional capacity by Martin Lehr, M.D. Tr. 132-139. Lehr, like Kehrli before him, found that Howard was able to lift and/or carry 50 pounds occasionally and 25 pounds frequently, to stand and/or walk approximately six hours in an eight-hour workday with ordinary breaks, to sit approximately six hours in an eight-hour workday, as having no limitations on pushing or

Page 14 - FINDINGS AND RECOMMENDATION

pulling, no manipulative limitations, no visual limitations, no communicative limitations, and no

environmental limitations except that he should avoid all exposure to hazards, and as having

occasional limitations on climbing ladders, rope or scaffolding, and on kneeling, crouching, and

crawling. *Id.* Lehr further found that Howard's self-report of his limitations on activities of daily

life were "not entirely credible as they are not fully supported by the medical evidence and the

record as a whole," and that Davidoff's January 2005 opinion that claimant needed a break to

stand and walk each hour was not supported by the body of evidence in the file. *Id.* Lehr

assessed Howard as retaining "the ability to perform medium level work with postural and

environmental restrictions." *Id.* In addition, Lehr "considered and adopted" the opinion of the

Administrative Law Judge who found Howard non-disabled in connection with his first

application for SSI benefits "as there isn't sufficient evidence to support a change in his condition

or circumstances that would allow for a change in decision." *id.*

Also on July 8, 2005, Howard underwent an assessment of his mental residual functional

capacity by Karen Bates-Smith, Ph.D. Tr. 140-157. Bates-Smith found that Howard suffered

from a brain injury causing psychotic disorder and hallucinations, depressive syndrome

characterized by anhedonia, appetite disturbance, sleep disturbance, decreased energy, feelings of

guilt or worthlessness, difficulty concentrating or thinking, thoughts of suicide, hallucinations,

delusions or paranoid thinking, anxiety disorder, and personality disorder characterized by

pathologically inappropriate suspiciousness or hostility, pathological dependence, passivity, or

agressivity, intense and unstable interpersonal relationships and impulsive and damaging

behavior, and substance abuse in partial remission by self report. *Id.* Bates-Smith characterized

Howard's personality disorders as including "[p]athologically inappropriate suspiciousness or

Page 15 - FINDINGS AND RECOMMENDATION

hostility," and "[i]ntense and unstable interpersonal relationships and impulsive and damaging behavior." *Id.* Bates-Smith assessed Howard as mildly limited in activities of daily living and as moderately limited in maintaining social functioning and in maintaining concentration, persistence or pace. *Id.*

Howard met with Blem on August 4, 2005 to discuss his medications and symptoms. Tr. 206-207. Blem recommended adjustments to Howard's diet and also to the timing of Howard's insulin regimen vis-à-vis meals. *Id.* Blem noted that Howard's issues with diarrhea were "drastically improved" and "well controlled." *Id.*

On July 2, 2007, Blem filled out a questionnaire prepared by Howard's attorney. Tr. 471-474. In his questionnaire responses, Blem opined that Howard could lift and/or carry 20 pounds occasionally and 10 pounds frequently, that he could stand and/or walk less than two hours in an eight-hour workday, that he could sit for six hours in an eight-hour workday, that he would not need to lie down during an eight-hour workday, that he had a limited ability to push or pull with upper or lower extremities, that he would need to be near a bathroom at all times during a workday and would require bathroom breaks at intervals of less than two hours, and that his medical condition would not require him to be frequently absent from work. *Id.* Blem explained that Howard's "diabetes is fairly well controlled; pancreatitis flares are rare; knee pain is manageable." *Id.*

On July 6, 2007, a hearing was held before an Administrative Law Judge. Tr. 482-531. At that hearing, Howard testified that, in consequence of his pancreatitis, he was required to pass bowel movements multiple times daily – five to six times on a "good" day and 10-12 times on an "average" day. Tr. 493. He indicated that the need to pass a bowel movement could come on

Page 16 - FINDINGS AND RECOMMENDATION

him so suddenly that he sometimes had "accidents" in public in which he was unable to make it

to a bathroom before doing so. Tr. 494. He further indicated that each trip to the bathroom could

take as little time as five minutes or as much time as an hour and a half. Tr. 495.

On September 20, 2007, the ALJ denied Howard's application for SSI benefits. Tr. 18-

27. Howard timely requested review of the ALJ's decision, Tr. 11, and the Appeals Council

denied his request on October 22, 2009, Tr. 4-6. In consequence, the ALJ's decision of

September 20, 2007, became the Agency's final order for purposes of judicial review. *See* 20

C.F.R. § 422.210(a); *see also, e.g.*, *Sims v. Apfel*, 530 U.S. 103, 107 (2000). This action

followed.

## SUMMARY OF ALJ FINDINGS

At the first step of the five-step sequential evaluation process, the Administrative Law

Judge found in her September 20, 2007, opinion that Howard did not engage in substantial

gainful activity at any time following his alleged disability onset date (as construed) of June 13,

2005. Tr. 20. She therefore proceeded to the second step of the analysis.

At the second step, the ALJ found that Howard's medical impairments of "insulin-

dependent diabetes mellitus, chronic pancreatitis secondary to alcohol abuse, episodes of diarrhea

controlled with medication, mild to moderate osteopenia of the bilateral knees, psychotic

disorder due to brain injury with hallucinations, alcohol abuse versus dependence, adjustment

disorder with mixed anxiety and depressed mood, dysthymic disorder, major depressive disorder,

anxiety disorder, not otherwise specified (NOS), and low intellectual functioning" were "severe"

for purposes of the Act. Tr. 20-21. Because the combination of impairments was deemed

severe, the ALJ properly proceeded to the third step of the analysis.

At the third step, the ALJ found that none of Howard's impairments was the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1. Tr. 22. The ALJ therefore properly conducted an assessment of Howard's residual functional capacity. Specifically, the ALJ found that during the relevant adjudication period Howard had:

> the residual functional capacity to lift 50 pounds occasionally, 25 pounds frequently; he can occasionally climb ladders/ropes/scaffolds, kneel, crouch and crawl, is able to frequently climb ramps and stairs, balance and stoop, and must avoid all exposure to hazards. The claimant requires a five-minute bathroom break every hour (accommodated by using the two, 15-minute breaks allowed in an eight-hour workday in increments of five-minute breaks throughout the day). He has mild limitations in activities of daily living, and moderate limitations (i.e., performance is limited, but not precluded) in abilities to maintain social functioning, concentration, persistence, and pace.

Tr. 22-23. She further indicated that she adopted the opinion of Leslie Davidoff, M.D., that Howard could stand or walk six hours out of an eight hour workday with hourly breaks, with the modification that Howard would require breaks only at intervals of two hours to do so. Tr. 26. In reaching these conclusions, the ALJ considered all of the objective medical evidence in the record, as well as Howard's own statements regarding his symptoms. Tr. 23-26.

At the fourth step of the five-step process, the ALJ found that Howard had no past relevant work, and therefore was unable to perform his past relevant work. Tr. 26.

At the fifth step, the ALJ found in light of Howard's age, education, work experience, and RFC that there were jobs existing in significant numbers in the national and local economy that he could perform. Tr. 26-27. Relying in part on the testimony of an objective vocational expert, the ALJ cited as examples of unskilled, sedentary jobs that Howard could perform despite the limitations listed in his RFC occupations including production assembler (361,000 jobs in the national economy and 9,710 jobs in the Oregon economy), hand packager (460,000 jobs in the

Page 18 - FINDINGS AND RECOMMENDATION

national economy), and janitor (2.3 million jobs in the national economy and 12, 350 jobs in the

Oregon economy).  *Id.*  Based on the finding that Howard could perform jobs existing in

significant numbers in the national economy, the ALJ concluded that he was not disabled as

defined in the Act at any time between June 13, 2005, and September 20, 2007.  Tr. 27.

## ANALYSIS

Howard challenges the Commissioner's assessment of his residual functional capacity.

Specifically, Howard argues that the Administrative Law Judge improperly rejected the medical

opinions of the state agency medical consultants who assessed Howard's residual functional

capacity, improperly rejected the opinion of Howard's pharmacist (a non-acceptable medical

source), and improperly rejected Howard's own lay opinion testimony.  Howard further argues

that the Commissioner failed to carry his burden at the fifth step of the five-step process in light

of the alleged errors in the ALJ's assessment of Howard's RFC.

I.      **Residual Functional Capacity**

A.      **Medical Opinions of State Agency Medical Consultants**

As noted above, the administrative record contains assessments of Howard's mental

residual functional capacity by state agency medical consultants Dorothy Anderson, Ph.D., and

Karen Bates-Smith, Ph.D.  Anderson assessed Howard as having moderate limitations in

maintaining social functioning, Tr. 250, including moderate limitations in his ability to work in

coordination with or proximity to others without being distracted by them, Tr. 254, and opined

that he would "do best at work performed alone and not as part of a team w[ith] no public

contact," Tr. 256.  Bates-Smith assessed Howard  as having moderate limitations in maintaining

social functioning, Tr. 150, finding that he suffers from [p]athologically inappropriate

suspiciousness or hostility," and "[i]ntense and unstable interpersonal relationships and impulsive and damaging behavior, Tr. 147. Bates-Smith opined that Howard "would need to avoid working around the general public and close, unstructured contact with co-workers." Tr. 155. Bates-Smith further opined that Howard was moderately limited in his ability to "travel in unfamiliar places." *Id.* Howard notes, correctly, that each of these medical opinions is supported by substantial medical evidence in the record (including, perhaps in particular, Zeedyk's notes of her December 29, 2004, psycho-diagnostic interview of Howard, Tr. 258-263), and the absence of any directly contradictory medical evidence. While the Administrative Law Judge included "moderate limitations . . . in abilities to maintain social functioning" in her findings regarding Howard's RFC, Howard argues that she erred by failing to include limitations on any contact with the general public, on close, unstructured contact with co-workers, and on ability to travel in unfamiliar places.

When a treating or examining physician's opinion is not contradicted by substantial medical evidence of record, it may be rejected by an ALJ only for "clear and convincing" reasons. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Here, the ALJ did not offer clear or convincing reasons, or indeed any reasons, for omitting the identified limitations from her assessment of Howard's RFC. However, with respect to the identified limitations on any contact with the general public and on close, unstructured contact with co-workers, the limitations were not omitted from the ALJ's assessment of Howard's RFC, but rather were represented by the posited "moderate limitations . . . in abilities to maintain social functioning." Anderson opined that Howard would "do best at work performed alone" without a team and without contact with the general public, but did not opine that his medical condition prohibited him from all contact

Page 20 - FINDINGS AND RECOMMENDATION

with the general public or from close, unstructured contact with co-workers, and while

Bates-Smith opined that Howard "would need to avoid working around the general public and

close, unstructured contact with co-workers," she likewise did not opine that Howard would be

unable to do so.

Moreover, even interpreting the state agency consultants' opinions as strictly prohibiting

Howard from performing work requiring contact with the general public or close, unstructured

contact with co-workers, the ALJ's error in omitting these limitations from her assessment of

Howard's RFC would necessarily be harmless.[8] According to the Dictionary of Occupational

Titles, which rates each listed occupation, *inter alia*, in terms of its requirements for ability to

interact with other people, two of the occupations identified by the ALJ as within Howard's

capabilities, production assembler and hand packager, require the lowest possible level of

interpersonal interaction. *See* Dictionary of Occupational Titles, 734.687-018, 920.587-018.

Because two occupations identified by the ALJ as suitable for someone with Howard's

limitations require the lowest possible level of interpersonal interaction, the ALJ's failure to

include the identified limitations on Howard's ability to interact with others was necessarily

harmless. *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008) (ALJ's failure to

include limitations on stooping in assessment of claimant's RFC harmless error because ALJ

limited claimant to sedentary occupations and "most unskilled sedentary occupations require very

---

[8] "A decision of the ALJ will not be reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005), *citing Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1991). An ALJ's error is harmless where it is inconsequential to the ALJ's ultimate determination and the ALJ's determination is supported by substantial evidence of record. *See Carmickle v. Comm'r of SSA*, 533 F.3d 1155, 1162 (9th Cir. 2008); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195-97 (9th Cir. 2004).

little to occasional stooping").

The ALJ's failure to provide clear and convincing reasons for rejecting Bates-Stubbs' opinion that Howard was moderately limited in his ability to travel in unfamiliar places constitutes error, as the identified limitation is not accounted for in any provision of the ALJ's assessment of Howard's RFC. However, this error was likewise necessarily harmless. Ability to travel in unfamiliar places is required only for occupations involving mobile or changing worksites, as, for example, the occupation of plumber, which requires travel to customers' homes. The occupations of production assembler and hand packager, by contrast, are performed in factory settings, and do not require travel to places that may be unfamiliar to workers in those occupations. *See* Dictionary of Occupational Titles, 734.687-018, 920.587-018. Because ability to travel in unfamiliar places is not a relevant consideration in the occupations identified by the ALJ as suitable for a person with Howard's limitations, the ALJ's failure to include a limitation on that ability was necessarily harmless.[9] *See Stubbs-Danielson*, 539 F.3d at 1174.

For the foregoing reasons, the Commissioner's decision should not be disturbed on the basis of the ALJ's failure to include in her assessment of Howard's RFC limitations on any contact with the general public, on close, unstructured contact with co-workers, and on ability to travel in unfamiliar places.

**B.    Lay Opinion of Pharmacist Christopher Blem, Pharm.D**

As noted above, Howard's pharmacist Blem, who provided Howard with assistance in

---

[9] Howard argues that the ALJ's error was not harmless, because ability to travel in unfamiliar places may be implicated in the process of obtaining a new job for the first time. However, in evaluating a claimant's RFC, the ALJ is required only to consider the claimant's ability to perform within the work setting, not the claimant's ability to conduct a job search. *See* 20 C.F.R. § 416.945.

self-administering insulin and in managing his symptoms, filled out a questionnaire prepared by

Howard's attorney on July 2, 2007. Tr. 471-474. In his questionnaire responses, Blem opined,

*inter alia*, that Howard could stand and/or walk less than two hours in an eight-hour workday, Tr.

472, and that he would need to be near a bathroom at all times during a workday and would

require bathroom breaks at intervals of less than two hours, *id.* These appear to be the limitations

the omission of which from the ALJ's opinion Howard now challenges, although he does not

identify the purportedly omitted limitations with specificity.

   In her assessment of Howard's residual functional capacity, the Administrative Law Judge

found that Howard could stand six hours in an eight-hour workday with breaks at intervals of two

hours, Tr. 26, and that Howard would require a five-minute bathroom break every hour of the

workday, Tr. 22-23. Howard argues that in making these findings, the ALJ improperly rejected

Blem's opinion of July 2, 2007.

   As a pharmacist, Blem is not an "acceptable medical source" as that term is used in the

Social Security regulations. *See* 20 C.F.R. 416.913(a). Thus, Blem's opinion constitutes an

opinion from a medical source who is not an "acceptable medical source." The Agency has ruled

in connection with such opinions that:

> The fact that a medical opinion is from an "acceptable medical source" is a factor
> that may justify giving that opinion greater weight than an opinion from a medical
> source who is not an "acceptable medical source" because, as we previously
> indicated in the preamble to our regulations at 65 FR 34955, dated June 1, 2000,
> "acceptable medical sources" "are the most qualified health care professionals."
> However, depending on the particular facts in a case, and after applying the
> factors for weighing opinion evidence, an opinion from a medical source who is
> not an "acceptable medical source" may outweigh the opinion of an "acceptable
> medical source," including the medical opinion of a treating source. For example,
> it may be appropriate to give more weight to the opinion of a medical source who
> is not an "acceptable medical source" if he or she has seen the individual more
> often than the treating source and has provided better supporting evidence and a

> better explanation for his or her opinion. Giving more weight to the opinion from
> a medical source who is not an "acceptable medical source" than to the opinion
> from a treating source does not conflict with the treating source rules in 20 CFR
> 404.1527(d)(2) and 416.927(d)(2) and SSR 96-2p, "Titles II and XVI: Giving
> Controlling Weight To Treating Source Medical Opinions."

S.S.R. 06-03p, 2006 SSR LEXIS 5. Notwithstanding the foregoing, as a medical source that is

not an "acceptable medical source," Blem is treated as a lay witness. "An ALJ need only give

germane reasons for discrediting the testimony of lay witnesses." *Bayliss v. Barnhart*, 427 F.3d

1211, 1218 (9th Cir. 2005), *citing Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001).

Inconsistency with medical evidence is considered a "germane" reason for discrediting lay

witness testimony. *See id., citing Lewis*, 236 F.3d at 511.

In finding that Howard was able to stand or walk for six hours out of an eight-hour

workday with breaks at two-hour intervals, the ALJ expressly relied on medical evidence of

record, primarily the medical opinions of state agency medical consultants Martin Kehrli, M.D.,

and Martin Lahr, M.D., each of whom opined that Howard could be expected to stand or walk for

six hours out of eight with routine breaks. Tr. 271, 138. The ALJ was entitled to afford the

opinions of Kehrli and Lahr more weight than Blem's lay opinion, and the inconsistency of

Blem's opinion with those of Kehrli and Lahr was a germane reason sufficient to justify the ALJ's

disregard of Blem's opinion.

In finding that Howard would require only hourly bathroom breaks of five minutes'

duration, the ALJ expressly relied on medical evidence that Howard's symptoms of diarrhea were

resolved as of June 20, 2005, Tr. 202-204, and that his problems with bowel movements were

"well controlled" by August 4, 2005, Tr. 206-207, as well as Blem's opinion of July 2, 2007, that

Howard's pancreatitis "flares" were "rare," Tr. 471-474. The ALJ did not err in relying on this

evidence, which was germane to the question whether Howard continued to suffer from severe diarrhea.

For the foregoing reasons, the Commissioner's decision should not be disturbed on the basis of the ALJ's rejection of Blem's opinion testimony.

### C.    Howard's Testimony

At the hearing before the Administrative Law Judge on July 6, 2007, Howard testified that he lacked the stamina to work an eight-hour day since his 1994 accident, Tr. 497, and that in consequence of his pancreatitis, he was required to pass bowel movements multiple times daily -- five to six times on a "good" day and 10-12 times on an "average" day, Tr. 493. He indicated that the need to pass a bowel movement could come on him so suddenly that he sometimes had "accidents" in public in which he was unable to make it to a bathroom before doing so. Tr. 494. He further indicated that each trip to the bathroom could take as little time as five minutes or as much time as an hour and a half. Tr. 495. Howard argues that the ALJ improperly rejected his testimony on these issues.

When a claimant's medical record establishes the presence of a "medically determinable impairment" that "could reasonably be expected to produce the [claimant's alleged] pain or other symptoms," the ALJ must evaluate the claimant's credibility in describing the extent of those symptoms. 20 C.F.R. § 416.929. In the event the ALJ determines that the claimant's report is not credible, such determination must be made "with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002), *citing Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (*en banc*).

In weighing a claimant's credibility, the ALJ may consider, *inter alia*, the "claimant's reputation for truthfulness, inconsistencies either in claimant's testimony or between h[is] testimony and h[is] conduct, claimant's daily activities, h[is] work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which claimant complains." *Id.* (internal modifications omitted), *citing Light v. SSA*, 119 F.3d 789, 792 (9th Cir. 1997). While a finding that a claimant lacks credibility cannot be premised solely on a lack of medical support for the severity of his symptoms, *see Light*, 119 F.3d at 792, *citing Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995), where the ALJ's credibility finding is supported by substantial evidence in the record, the finding will not be disturbed, *Thomas*, 278 F.3d at 959, *citing Morgan v. Commissioner of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999).

Here, the ALJ adduced a significant body of evidence of record in support of her finding that Howard was not credible on these issues. As to his credibility in general, the ALJ noted the significant inconsistencies in Howard's reports to various health care providers, including his statements that he was once involved with a gang and that the incident in which he was injured may have been gang-related versus his statement that he was never in a gang, his reports of severe memory gaps versus his normal performance on tests of memory, his report that he was once married versus his report that he was never married, his report that he had one child versus his report that he had three children versus his testimony that he had five children, his reports that he had never been arrested versus his report of having once been incarcerated versus his report of having twice been incarcerated, and his report that he had never drunk alcohol versus his report that he rarely drank alcohol versus his report that he occasionally drank alcohol. Tr. 25. In addition, the ALJ opined that Howard's own self-report of his daily activities was inconsistent

Page 26 - FINDINGS AND RECOMMENDATION

with his claim to disabling levels of limitation, noting that he did chores around the house and yard, helped with shopping, and attended church twice monthly. Tr. 25. The ALJ also noted Howard's employment in 2004 as inconsistent with his claimed limitations; Howard provided testimony that he worked a 12-hour shift for eight or nine months in 2004, standing most of the time. Tr. 25, 495, 502.

With specific regard to Howard's testimony regarding his need for frequent bowel movements, the ALJ noted that his testimony was not borne out by the clinical records, including medical evidence that Howard's symptoms of diarrhea were resolved as of June 20, 2005, Tr. 202-204, and evidence that his problems with bowel movements were "well controlled" by August 4, 2005, Tr. 206-207, and that Howard's pancreatitis "flares" were "rare" as of July 2007, Tr. 471-474.

Because the ALJ's credibility finding is supported by substantial evidence of record, it should not be disturbed. The Commissioner's final decision should therefore not be disturbed on the basis of the ALJ's rejection of Howard's testimony regarding his symptoms.

## II.    Step Five: Existence of Jobs the Claimant Could Perform in the National Economy

As noted above, plaintiff argues that the Administrative Law Judge erred in her assessment of his residual functional capacity. On that basis, plaintiff argues that the Commissioner failed to meet his burden at the fifth step of the five-step process to demonstrate that, in light of his residual functional capacity, Howard was capable of performing jobs existing in significant numbers in the national economy. However, as noted above, the ALJ either did not err or erred only harmlessly in her assessment of Howard's RFC. Specifically, the Commissioner was entitled to rely on the ALJ's finding that, despite the limitations listed in his RFC, Howard

could perform occupations including production assembler (361,000 jobs in the national economy and 9,710 jobs in the Oregon economy) and hand packager (460,000 jobs in the national economy). In consequence, the Commissioner met his burden at the fifth step of the five-step sequential process.

## CONCLUSION

For the reasons set forth above, I recommend that the Commissioner's final decision in connection with Howard's June 13, 2005, application for SSI benefits be affirmed. A final judgment should be prepared.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 25th day of April, 2011.

Honorable Paul Papak
United States Magistrate Judge

Page 28 - FINDINGS AND RECOMMENDATION